1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA LEMUS,                    ) | 1:09-cv-01146 GSA |
|                                  ) | |
|                                  ) | |
|                                  ) | ORDER REGARDING PLAINTIFF'S |
|               Plaintiff,         ) | SOCIAL SECURITY COMPLAINT |
|                                  ) | |
|      v.                          ) | |
|                                  ) | |
| MICHAEL J. ASTRUE, Commissioner  ) | |
| of Social Security,              ) | |
|                                  ) | |
|                                  ) | |
|               Defendant.         ) | |
| _____ ) | |

## **BACKGROUND**

Plaintiff Sandra Lemus ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

///

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  On August 13, 2009, the action was reassigned to the Honorable Gary S. Austin for all purposes.

1
## FACTS AND PRIOR PROCEEDINGS[2]

2       Plaintiff protectively filed an application for disability insurance benefits on October 11,

3   2005, alleging disability beginning August 10, 2002, due to lumbar disc syndrome, as well as

4   cervical and sacroilliac dysfunction.  (AR 98-99, 105.)  Plaintiff's application was denied initially

5   and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge

6   ("ALJ").  (AR 6-9, 82, 89.)  ALJ Michael J. Haubner held a hearing on June 1, 2007, and issued

7   an order regarding benefits on July 13, 2007, finding Plaintiff was not disabled.  (AR 10-20.)  On

8   May 1, 2009, the Appeals Council denied review.  (AR 3-5.)

9       **Hearing Testimony**

10      ALJ Haubner held a hearing on June 1, 2007, in Fresno, California.  Plaintiff appeared

11  and testified; she was not represented by an attorney.  (AR 32-61.)  Vocational Expert ("VE")

12  Thomas Dachelet also testified.  (AR 61-71.)

13      Plaintiff resides in Porterville, California, with her husband, their four children ages

14  twelve to twenty, her daughter-in-law, and her eighteen month-old grandson.  Their house is a

15  single family, single level home that utilizes a single step upon entry.  (AR 42, 46-48.)  At the

16  time of the hearing, Plaintiff was thirty-nine years old.  (AR 42.)  She is a high school graduate

17  and has received vocational training for employment as a psychiatric technician and laboratory

18  technician assistant.  (AR 42-43, 45-46.)

19      Twice a week Plaintiff uses the computer to look for full-time work, and had done so as

20  recently as the week of the June 1, 2007, hearing.  (AR 44.)  Moreover, as recently as two weeks

21  prior to the hearing she babysat her grandson daily, averaging five to eight hours per day.  (AR

22  48.)  She later clarified that her daughter-in-law, who neither works nor goes to school, was also

23  at home during those hours.  As a result, Plaintiff actually babysat for about two hours, rather

24  than the five to eight hours previously indicated.  (AR 48-49.)

25      Plaintiff can take care of her personal needs such as showering, getting dressed, brushing

26  her teeth and hair, and using utensils to feed herself.  (AR 49-50.)  About three times per week,

27  _____

28      [2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1   Plaintiff will cook or prepare a meal and also prepares simple meals twice a day.  (AR 50.)  She

2   does dishes twice per day, cleans the kitchen daily and cleans two bathrooms once a week.  (AR

3   50-51.)  She sweeps the floors daily and mops the floors once a week; she also vacuums the

4   house weekly.  (AR 51-52.)  She does not wash the windows or take out the trash.  (AR 50-52.)

5   Plaintiff does a load of laundry daily.  She also irons the laundry bi-weekly.  (AR 52-53.)

6       About three to four times per week, Plaintiff drives an automatic SUV.  (AR 47.)  She

7   goes grocery shopping about every three weeks and does other shopping about every two weeks.

8   (AR 53.)  She attends church twice per week during which she sits, stands and kneels.  *Id*.  She

9   does not belong to any clubs or organizations, but will visit family and friends once a month, and

10  will eat out about once a month.  (AR 53-54.)

11      Plaintiff uses the telephone three to four times per day.  (AR 54.)   She reads daily for

12  about an hour and a half.  (AR 55.)  Plaintiff does not watch television daily because she "[does

13  not] have time for that" because she is otherwise occupied doing household chores "little by

14  little."  *Id*.  On days she is able to watch television, she watches for about an hour and a half.  *Id*.

15  She also listens to a radio for approximately twelve hours per day, and uses a home computer

16  about an hour every day.  (AR 56.)

17      The ALJ confirmed with Plaintiff that her current health conditions include a history of

18  lumbar disc syndrome, "some neck and mid back problems," migraine headaches, and high blood

19  pressure.  (AR 56-57.)  Plaintiff's high blood pressure is controlled with medication.  (AR 57.)

20  Since 1992, Plaintiff has endured migraines three times per week, each lasting from four hours to

21  seven days.  *Id*.  These migraine headaches cause Plaintiff to become nauseated and light-

22  sensitive, and result in her seeking out a dark room to lie down in order to gain relief.  (AR 57-

23  58.)  To treat her migraines, Plaintiff's doctor has prescribed the same medication used to treat

24  her back because she states her doctor has told her that there was "really nothing to control"

25  them.  (AR 57.)  Sometimes the medication will not begin to help until "days after" she takes it.

26  (AR 58.)  On average, Plaintiff states that out of thirty days she would miss twelve "[e]asily" due

27  to migraine headaches.  (AR 59.)

28

1    Plaintiff estimated that she could lift and carry ten pounds using both hands, stand for

2    fifteen to thirty minutes at a time, sit for about an hour if she was permitted to shift in her chair,

3    walk about a quarter of a mile, and needs to lie down daily for about three hours.  (AR 59-60.)

4    The ALJ then elicited testimony from VE Dachelet regarding Plaintiff's past work.  (AR

5    61-71.)  The VE characterized Plaintiff's past work pursuant to the Dictionary of Occupational

6    Titles ("DOT") as follows: (1) psychiatric technician, a medium exertional level, skilled position;

7    (2) medical assistant, a medium semi-skilled position, four; (3) order filler, a light semi-skilled

8    position, three; and (4) lab tech assistant, a light skilled position, five.  (AR 63-64.)  Plaintiff's

9    past work as a grape picker and cashier attendant were not considered relevant to the disability

10   analysis by the ALJ.  (AR 63.)  The VE testified that Plaintiff's past work would have included a

11   "wide range [of skills] that apply in the medical field."  (AR 64.)  More specifically, this range

12   included: performing medical tests, conducting quantitative and qualitative chemical analyses of

13   body fluids, conducting blood tests for transfusion purposes, administering oral and hypodermic

14   injection, helping patients with personal hygiene, recording and measuring patients' general

15   physical conditions (pulse, temperature, respiration, etc.) observing patients in order to detect

16   behavior patterns, intervening to restrain violent, potentially violent and suicidal people, leading

17   prescribed individual or group therapy sessions, as well as typing, computer operation and

18   general office practices.  *Id*.  The VE also testified that there was transferability of past relevant

19   work skills.  (AR 64-65.)

20   VE Dachelet was then asked to consider several hypothetical questions posed by the ALJ.

21   First, the VE was asked to assume a hypothetical worker of Plaintiff's age, education, language

22   and experience background, who is right-handed, could lift and carry twenty pounds

23   occasionally, ten pounds frequently, could stand or walk four hours at a time, could sit for six

24   hours out of eight, could occasionally push and pull with the non-dominant left hand, and could

25   occasionally stoop and crouch.  (AR 65.)  The VE indicated the hypothetical worker could not

26   perform Plaintiff's past relevant work.  (AR 66-67.)  As to other work, the VE testified that such

27   an individual would be able to sustain employment at the light, unskilled level with a sit/stand

28   option, such as a bagger (33,371 available jobs nationally; 10,457 available jobs in California), a

4

garment sorter (33,571 jobs available nationally; 11,190 jobs available in California), and a
grader (20,575 jobs available nationally; 6,858 jobs available in California).  (AR 67-69.)

The ALJ then proposed a second hypothetical based on the medical opinion of Dr. Jamie
Lewis.  (AR 69-70, 413-414.)  This hypothetical assumed the following functional assessment:
the individual could stand and walk for approximately four non-continuous hours out of an eight-
hour work day; could sit for approximately six non-continuous hours out of an eight hour work
day and would benefit from an environment where sitting and standing could be alternated; could
bend, balance, climb, kneel, squat, push and pull for a period of less than one-third of the day;
does not require an assistive device for mobility; could frequently lift objects up to ten pounds
and occasionally carry objects up to twenty pounds; is capable of performing fine and gross
motor manipulative tasks with both upper extremities without restrictions; and has no specific
environmental restrictions.  (AR 69-70, 413-414.)  Considering these limitations, the VE testified
that the hypothetical worker could not perform Plaintiff's past relevant work, but could, as in
hypothetical number one, perform the bagger, garment sorter, and grader positions, allowing for a
sit/stand option.  The availability of jobs for these positions was identical to that as stated in
hypothetical number one.  (AR 69-70.)

The third hypothetical proposed by the ALJ was based on the Plaintiff's testimony at the
hearing.  (AR 70.)   In this hypothetical, the VE was asked to assume the individual: could lift
and carry ten pounds, could sit one hour at a time, could stand for fifteen to thirty minutes at a
time, could walk approximately a quarter of a mile at a time, would need to lie down three hours
out of eight, and would miss approximately twelve days out of thirty.  *Id*.  In light of these
limitations, the VE testified that the hypothetical worker could not perform Plaintiff's past
relevant work, nor any other work.  (AR 70-71.)

**Medical Record**

The entire medical record was reviewed by the Court.  Those records relevant to the
issues on appeal are summarized below.  Otherwise, the medical evidence will be referenced as
necessary in this Court's decision.

1   ***Robert Gazmarian, M.D.***

2       On October 29, 2002, Plaintiff underwent a comprehensive physical medicine and

3   rehabilitation consultation with Robert Gazmarian, M.D., for state workers' compensation

4   purposes concerning her complaints of low back pain.  Plaintiff reported to Dr. Gazmarian that

5   on August 10, 2002, she was injured while providing care to a patient.  (AR 165.)  Dr.

6   Gazmarian's examination revealed the following concerning Plaintiff's lumbosacral spine and

7   lower extremities: a dynamic pain assessment showed pain free motion in extension, lateral

8   bending and rotation, and mild pain with flexion; full range of motion in flexion, extension, right

9   and left lateral bending, and right and left rotation; no lumbar paraspinal muscle spasm, list, or

10  tenderness of the spinous process, facet joints, sacroiliac joint, sciatic notch, or posterior thigh;

11  facet stress test was negative; sitting and supine straight leg raise, heel walking, toe walking, and

12  sensory examination of the lower extremities were all within normal limits; motor examination

13  of the lower extremities revealed no gross muscle atrophy or weakness; and the lumbosacral

14  intersegmental spine motion was "pain free."  (AR 166-167.)

15      Dr. Gazmarian compared two magnetic resonance images (MRI) dated September 14,

16  2002, and February 19, 2002.  (AR 167, *see also* AR 404-405.)  The September MRI impression

17  documented: (1) a central lumbar disc protrusion without significant impingement upon the

18  thecal sac at L5-S1; and (2) a broad-based mild lumbar disc bulge without significant

19  impingement upon the thecal sac at L4-L5.  (AR 405.)  In comparison, the February MRI

20  revealed: (1) decreased disc space at L4-5 and L5-S1 consistent with degenerative disc disease;

21  (2) a small broad-based disc bulge of one to two millimeters at L4-5; and (3) a three millimeter

22  central lumbar disc protrusion without foraminal narrowing.  (AR 167.)

23      Dr. Gazmarian diagnosed Plaintiff with: (1) left lumbosacral strain (August 10, 2002); (2)

24  a history of lumbosacral strain; (3) a history of lumbar spine injury in 1998 that was unrelated to

25  the above; and (4) lumbar degenerative disc disease at L4-5 and L5-S1.  (AR 167.)  The doctor

26  further opined that while Plaintiff did have a history of back injury in the past, Plaintiff stated

27  that her pains had resolved, and she had not had any continuing pain or discomfort that resulted

28  in physical impairment or a loss of work.  (AR 167-168.)  Dr. Gazmarian further opined that the

lumbosacral pain experienced by Plaintiff was "muscular in nature," and while the February 19, 2002, MRI did reveal degenerative changes at L4-5 and L5-S1, "those [degenerative changes] are a progression . . . unrelated to her current symptomatology. (AR 168.)   Additionally, the Dr. Gazmarian pointed out that "[Plaintiff] is feeling much better, which is consistent with muscular pain and discomfort." (AR 168.)

*Gregory Johnson, D.C.*

Plaintiff was under the care of her treating chiropractor Gregory Johnson, D.C., from February 1, 2003, to November 31, 2003. (AR 174-374.)  Initially, Dr. Johnson diagnosed Plaintiff with: (1) lumbar disc syndrome with mylopathy; (2) radiculitis; (3) sacroiliac segmental dysfunction; (4) thoracic segmental dysfunction; (5) cervical segmental dysfunction; and (6) myofascitis.  AR 350.  On March 20, 2003, Dr. Johnson amended his diagnoses to also include: (7) left hip bursitis; (8) cerviobrachial/cerviocranial syndrome; and (9) parathesia S1.  (AR 365.)

On April 4, 2003, Plaintiff underwent an MRI of her lumbosacral spine pursuant to Dr. Johnson's referral.  AR 315-316.  Mario Deuchi, M.D., conducted the MRI study and found that "[t]he conus medullaris terminates at the level of L1 and appears unremarkable.  Desiccation of the intervertebral discs is visible from L4 to S1 levels.  Minimal osteophytes are noted.  These findings are consistent with minimal degenerative disc disease." (AR 315.)  His impression of the MRI study was that the MRI revealed an L4/L5 posterior disc protrusion and L5/S1 posterior disc protrusion.  (AR 316.)

On April 14, 2003, Plaintiff underwent an electromyogram and nerve conduction study. (AR 307-309.)  This study was ordered to evaluate Plaintiff's complaints of low back pain.  (AR 307.)  The electrodiagnostic findings revealed normal operation in all five areas tested.  (AR 309.)  The impression of the doctor conducting the study was as follows: (1) there is no evidence of a peripheral neuropathy; (2) there is no evidence of a left lumbar motor radiculopathy; and (3) this does not rule out a sensory radiculopathy.  *Id*.

*Tomas Rios, M.D.*

On July 14, 2003, internist Tomas Rios examined Plaintiff at Dr. Johnson's request to determine if Plaintiff would benefit from medications.  (AR 280.)  Dr. Rios' examination of

Plaintiff's neck revealed: a supple neck; full range of motion with mild pain at the end ranges; mild tenderness in the para-cervical musculature; and no palpable masses or bruits.   His examination of Plaintiff's back revealed: the spine was midline with straightening of the lumbar lordosis; knots and exquisite soreness in the left lumbosacral area; straight leg raises elicited low back pain, but failed to identify any dural sheath irritation; an awkward gait due to back and left lower extremity pain; and no sensation to pinprick at the base, nor in the left second and third toes. (AR 279.) Dr. Rios diagnosed Plaintiff with: (1) lumbar disc syndrome, possibly herniated disc at L4-5; and (2) myofascitis, cervical and thoracic spine. *Id*. Based on this diagnosis, Dr. Rios prescribed Bextra, Soma, and Ultram.  (AR 280.)

On July 28, 2003, Plaintiff returned to Dr. Rios stating that she was experiencing "good relief with the medications in combination with treatment being provided by . . . Dr. Johnson. She was instructed to continue with the medications as directed." (AR 270-271.)

On August 25, 2003, Plaintiff was again seen by Dr. Rios for medication refills due to flared back pain, caused by recent repetitive bending and resulting in moderate discomfort.  (AR 257.)  Dr. Rios noted on his supplemental report that "[Plaintiff] reports that she is much improved today.  She reports that generally she has no severe back pain or sciatica throughout the day.  She states that she learned from Dr. Johnson how to avoid injuries and how to prep her back for each days usual routine." (AR 256.)  His examination revealed: minimal paravertebral muscle spasms; no sciatica; straight leg raising was negative; the range of motion of the lumbosacral spine was minimally restricted with pain at the end ranges of flexion/extension; normal heel and toe walk; and lower extremity deep reflexes were "2+," with no sensory defects identified with pinprick. *Id*.

On August 29, 2003, Plaintiff reported marked increase in her lower back pain. (AR 252-253.)  On examination, Dr. Rios noted: Plaintiff was very tense and appeared uncomfortable while sitting; marked spasms were present throughout the paraspinous muscles; and limited range of motion present in the lumbar spine due to spasms.  (AR 252.)  Dr. Rios commented that "[Plaintiff] continues to have subjective complaints of low back pain.  She indicated that she would like to try going without her medication." (AR 253.)

8

1    ***Jaime Lewis, M.D.***

2         On February 4, 2006, Jaime Lewis, M.D., performed a comprehensive orthopedic

3    evaluation.  (AR 407-414.)  Plaintiff reported that she was capable of: walking one-eighth of a

4    mile; sitting or standing for about fifteen minutes; reading, shopping, driving, bathing, dressing,

5    and feeding herself; and using a computer and telephone.  (AR 408.)  However, she experienced

6    pain when she washed the dishes, vacuumed, swept, or took out the garbage.  *Id*.  She also

7    reported that her current medications included "an assortment of multiple vitamins and natural

8    supplements."  *Id*.

9         Dr. Lewis' examination of Plaintiff's cervical spine revealed the following: lateral flexion

10   0-45 degrees to both the left and right; 0-50 degrees of flexion and 0-60 degrees of extension

11   from neutral; 0-80 degrees of both dextro and levorotation; and mild tenderness to palpation over

12   the left cervical paraspinal musculature.  (AR 411.)  An evaluation of Plaintiff's thoracic spine

13   revealed: 0-70 degrees of flexion; 0-25 degrees of extension; 0-25 degrees of lateral flexion to

14   both the left and right; 0-25 degrees of lateral rotation to the right and left; and tenderness to

15   palpation over the left paraspinal musculature, left sacroilliac joint, and the left gluteal

16   musculature.  *Id*.  During the examination, Dr. Lewis also observed that Plaintiff "appeared in no

17   acute distress.  She is able to navigate the layout of the clinic, climb on and off the exam table,

18   and don and doff her shoes without difficulty."  (AR 409.)  Dr. Lewis diagnosed Plaintiff with

19   "(1) [c]hronic back pain with MRI documenting disc protrusions at L4-L5 and L5-S1 with exam

20   evidence of left sacroiliac dysfunction and mild weakness in sensory impairment in the left

21   myotome and dermatome.  (2) myofacial neck pain. (3) mild left lateral epicondylitis."  (AR

22   413.)

23         Ultimately, Dr. Lewis concluded in his functional assessment that Plaintiff could: stand

24   and walk for approximately four non-continuous hours in an eight-hour workday; sit for

25   approximately six non-continuous hours out of an eight-hour workday and would benefit from an

26   environment that would permit her to alternate sitting and standing; bend, balance, climb, kneel,

27   squat, push, and pull for a cumulative period of less than one-third of her day, and that prolonged

28   performance would cause significant pain; frequently lift and carry objects up to ten pounds and

occasionally carry objects up to twenty pounds; perform fine and gross motor manipulative tasks with both arms without restriction; without environmental restrictions.  (AR 413-414.)

### Roger D. Fast, M.D.

On March 7, 2006, Plaintiff's medical file was reviewed by state agency physician Roger D. Fast, M.D.  AR 415-422.  Dr. Fast's primary diagnosis was "lumbar DDD."  Secondarily, he diagnosed Plaintiff with myofacial neck pain and morbid obesity.  He also identified "other alleged impairments," as "mild epicondylitis," on the left.  (AR 415.)

As to external limitations, Dr. Fast opined that Plaintiff could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight-hour workday[3]; sit for about six hours in an eight-hour workday; push and/or pull limited in her upper extremities to occasional use with left arm.  (AR 416.)  Dr. Fast explained that the above limitations were "due to back pain and morbid obesity and slight weakness (-5/5) [in Plaintiff's] left leg." *Id*.

As to postural limitations, Dr. Fast noted that Plaintiff could frequently climb, balance, kneel, and crawl; she could also occasionally stoop and crouch.  (AR 417.)  Dr. Fast opined that this was due to back pain with decreased flexion.  *Id*.

With regard to Plaintiff's symptoms alleged to produce physical limitations, Dr. Fast opined "[Plaintiff] has objective signs of her MDI [medically determinable impairments] but her allegations are not fully credible.  She states that her limitations are due to back pain, but her only medications are supplements and vitamins.  Physical exam shows that she has capability of more than 15 minutes stand and 25 minutes sit."  (AR 420.)  Dr. Fast also stated that the treating or examining source statements noted in the file,  and the corresponding conclusions regarding physical limitations, were not significantly different from his own.  (AR 421.)

### Ricardo Valdes Jerez, M.D.

Also contained in the medical record are two MRIs conducted by Ricardo Valdez Juarez, M.D., while Plaintiff was in Mexico.  (AR 429-430A.)  The MRI of Plaintiff's lumbar spine

---

[3] Dr. Fast's handwritten notes also indicate Plaintiff has the ability to stand and walk for four hours.  AR 416.

indicated: (1) spondiloarthrosis changes; (2) T11-T12 posterior disc protrusion, central; and (3) left L4-L5 and L5-21 posterolateral discal hernia.  (AR 429A.)  The MRI of Plaintiff's cervical spine indicated: (1) spondilosis changes; (2) C5-C6 left posterolateral discal hernia; and (3) C6-C7 right posterolateral discal hernia.  (AR 430A.)

**ALJ's Findings**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  (AR 13-20, *see also* C.F.R. § 404.1520 (2009).)   The ALJ found that Plaintiff had not engaged in substantial gainful activity since August 10, 2002.  The ALJ identified the following severe impairments: lumbar disc syndrome; cervical, thoracic and lumbar disc protrusions; myofascitis of the cervical and thoracic spine; and headaches.  (AR 15.)  Nonetheless, the ALJ determined that the severity of the Plaintiff's impairments do not, individually or in combination, meet or exceed any of the listed impairments.  (AR 16.)

Based on his review of the entire record, the ALJ determined that Plaintiff has the residual functional capacity to "perform a wide range of light work," which specifically included the capacity to: lift/carry up to twenty pounds occasionally and ten pounds frequently; stand/walk up to four hours each in an eight-hour day; sit up to six hours in an eight-hour day with alternate sitting/standing; pushing/pulling limited to occasionally with left upper extremity; postural activities limited to frequent climbing (ramp/stairs, ladder/rope/scaffolds), balancing, kneeling and crawling; and, occasional stooping and crouching.  (AR 16.)

Next, the ALJ determined that Plaintiff could not perform her past relevant work.  (AR 19.)  The ALJ did, however, find that there was other employment available in both the local and national economy that Plaintiff could perform; specifically, these jobs included: bagger, garment sorter, and grader.  (AR 19-20.)

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial

11

evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an

impairment or combination of impairments which meets or equals one of the impairments set forth in 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) was unable to perform her past relevant work; yet (5) retained the residual functional capacity (RFC) to perform other jobs that exist in significant numbers in the national economy.  (AR 15-20.)

Here, Plaintiff argues that the findings are not supported by substantial evidence and are not free of legal error because (1) the ALJ improperly assessed Plaintiff's subjective symptom testimony when he deemed Plaintiff not disabled at step five of the sequential disability evaluation process; and (2) the ALJ failed to articulate clear and convincing reasons for finding the Plaintiff's subjective symptom testimony less than credible.  (Doc. 16 at 5-16.)  Stated differently, Plaintiff is arguing that substantial evidence does not support the ALJ's finding that Plaintiff was not disabled and that the ALJ committed legal error when it failed to articulate sufficient reasons for discounting Plaintiff's credibility.  These issues will be discussed in reverse order.

## DISCUSSION

### A.     *The Credibility Determination*

As stated above, Plaintiff contends that the ALJ committed legal error by failing to offer adequate reasons for partially rejecting her testimony concerning the intensity, persistence and limiting effects of her symptoms.[4]  (Doc. 16 at 5-16.)  In support of her position, Plaintiff argues that: (1)  the ALJ may not reject subjective pain testimony solely on the basis of objective medical evidence; (2) credibility is impacted by testimony of daily activities only if the level of activity was inconsistent with Plaintiff's claimed limitations; (3) the ALJ's credibility determination is inconsistent in that it found Plaintiff credible as to her daily activities and then not credible as to the impact of her medical impairments on those activities; and finally, (4) the ALJ failed to sufficiently articulate how Plaintiff's daily activities, missed appointments, and desire and attempts to reenter the work force relate to her ability to perform substantial gainful work activity.  (Doc. 16 at 5-16.)  In response, Defendant contends that the ALJ's determination

---

[4]Plaintiff characterizes the ALJ's treatment of her testimony as one of complete rejection, however, the ALJ clearly states that he found Plaintiff "not entirely credible."  (AR 18.)

1    that Plaintiff was only partially credible was not arbitrary and is supported by substantial

2    evidence: namely, her multiple failed doctor appointments, testimony regarding her daily

3    activities, ongoing employment efforts, and the inconsistency between Plaintiff's testimony and

4    the medical evidence.  Defendant also contends that Plaintiff misstates the disability standard

5    employed by the ALJ.  (Doc. 21 at 7-14.)

6         As an initial matter, this Court recognizes that review of the ALJ's credibility

7    determination is limited; only an irrational determination will be disturbed.  *Burch v. Barnhart*,

8    400 F.3d 676, 680-81 (9th Cir. 2005) (Although evidence supporting an ALJ's conclusions might

9    also permit an interpretation more favorable to the claimant, this Court must uphold the ALJ's

10    decision where the evidence is susceptible to more than one rational interpretation).

11         This Court is also cognizant that the ALJ is not required to comment on every detail in

12    every report.  As stated in *Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984), "[t]he

13    Secretary . . . need not discuss all evidence presented to her. Rather, she must explain why

14    'significant probative evidence has been rejected.'"   Likewise, it is not necessary for the ALJ to

15    repeat the magical incantation, "I reject _____'s opinion because . . .."  *See Magallanes v.*

16    *Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).  A reviewing court may draw specific and legitimate

17    inferences from discussions of the evidence, particularly where conflicting evidence is detailed

18    and interpreted, and findings are made, in order to assess why a statement or opinion has been

19    rejected or accepted.  *Id*.  Morever, even where an ALJ's credibility decision may include an

20    improper basis, it may be upheld on other bases.  *See eg., Batson v. Barnhart*, 359 F.3d 1190,

21    1197 (9th Cir. 2004).

22         Credibility determinations at the administrative level utilize a two-step analysis.  *Smolen*

23    *v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).  First, the claimant must produce objective

24    medical evidence of an impairment that could reasonably be expected to produce some degree of

25    the symptom or pain alleged.  *Id.* at 1281-1282.  If the claimant satisfies the first step and there is

26    no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of

27    his symptoms only if he makes specific findings that include clear and convincing reasons for

28    doing so.  *Id*. at 1281.  The ALJ must "state which testimony is not credible and what evidence

1   suggests the complaints are not credible." *Mersman v. Halter*, 161 F.Supp.2d 1078, 1086 (N.D.

2   Cal. 2001), quotations & citations omitted ("The lack of specific, clear, and convincing reasons

3   why Plaintiff's testimony is not credible renders it impossible for [the] Court to determine

4   whether the ALJ's conclusion is supported by substantial evidence"); Social Security Ruling

5   ("SSR") 96-7p (ALJ's decision "must be sufficiently specific to make clear to the individual and

6   to any subsequent reviewers the weight the adjudicator gave to the individual's statements and

7   reasons for that weight").

8          The first step in assessing Plaintiff's subjective complaints is to determine whether

9   Plaintiff's condition could reasonably be expected to produce the pain or other symptoms

10  alleged. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  Here, Plaintiff suffered

11  from the following impairments: lumbar disc syndrome; cervical, thoracic and lumbar disc

12  protrusions; myofascitis of the cervical and thoracic spine; and headaches.  (AR 16.)  When

13  making his finding as to Plaintiff's RFC, the ALJ found that "[Plaintiff's] medically determinable

14  impairments could reasonably be expected to produce some of the alleged symptoms, but that the

15  [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these

16  symptoms are not entirely credible."  (AR 17-18.)  This finding satisfies step one of the

17  credibility analysis.  *Smolen*, 80 F.3d at 1281-1282.

18         Moving to step two, in the absence of a finding that a claimant is malingering, an ALJ is

19  required to provide clear and convincing reasons for rejecting Plaintiff's testimony.  *Smolen*, 80

20  F.3d at 1283-1284; *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (as amended). When there

21  is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's

22  testimony regarding the severity of his symptoms solely because they are unsupported by medical

23  evidence. *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7.  Moreover, it is not

24  sufficient for the ALJ to make general findings; he must state which testimony is not credible and

25  what evidence in the record leads to that conclusion.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th

26  Cir. 1993); *see also Bunnell*, 947 F.2d at 345-346; *Burch v. Barnhart*, 400 F.3d at 680; and

27  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

28

In this case, the ALJ made the following findings regarding Plaintiff's credibility:

After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The objective evidence reveals mildly abnormal findings: an MRI dated September 14, 2002 revealed decreased disc space at L4-5 and L5-S1 consistent with degenerative disc disease.  On April 4, 2003, an MRI of the lumbosacral spine revealed L4/L5 disc protrusion and L5/S1 disc protrusion with mild stenosis.  An electrodiagnostic study on April 14, 2003 revealed no evidence of peripheral neuropathy.  X-rays taken on February 19, 2007 in Mexico revealed cervical spondylosis and a herniated disc at C5-6; lumbar x-rays reveal a disc protrusion at T11-12 and a herniated disc at L4-5 and L5-S1.

There are multiple worker's compensation check-block forms indicating that the claimant was temporarily totally disabled at various times.  However, I afford them little weight because the lack all signs, symptoms, residual functional capacity assessment, or indication of any bases for the opinions.  Moreover, the forms are all signed by chiropractors, who are not acceptable medical sources under the Regulations.  More importantly, the chiropractors' opinions that claimant is "disabled" impact an issue reserved to the Commissioner under the Social Security Act.

As for the opinion evidence, on February 4, 2006, Jamie Lewis, M.D., a consultative examiner (CE), found that the claimant could perform a wide range of light work; stand/walk up to 4 hours in an 8-hour day; sit up to 6 hours in an 8-hour day with alternate sitting/standing; postural activities limited to less than 1/3 of the work day; lift/carry up to 20 pounds occasionally and 10 pounds frequently.  The CE diagnosed chronic back pain based on MRI evidence of disc protrusion and mild muscle weakness; myofascial neck pain; and mild left lateral epicondylitis.  The diagnoses were based on the MRI report dated September 16, 2002; and, mild tenderness on palpation of the cervical and lumbar paraspinal muscles.  I find the CE's opinion is entitled to substantial weight as it is supported by the objective findings.  The CE's opinion is also supported by the State nonexamining DDS medical consultant's opinion: based on the objective findings of record including the CE's examination findings, the consultant opined that the claimant could perform light work with occasional postural activities.

Although the claimant testified that she is fully compliant with medications and treatment, her credibility is diminished due to her record of multiple failed appointments.  The claimant's credibility is further diminished due to the wide range of activities of daily living performed and her ongoing efforts to obtain employment.

(AR 16-18, internal citations omitted.)  The ALJ articulated adequate reasons for partially

rejecting Plaintiff's pain testimony.  Contrary to her argument, the ALJ did not "solely" rely on

any single piece of evidence.  (Doc. 16 at 8-9.)  Rather, the ALJ looked to the entire record and

specifically considered Plaintiff's daily activities, missed medical appointments and ongoing

efforts to secure employment to justify discrediting her testimony.  (AR 13, 15-18.)

1    An ALJ can consider many factors when assessing the claimant's credibility.  *See Light v.*

2  *Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ can consider the claimant's

3  reputation for truthfulness, prior inconsistent statements concerning symptoms, other testimony

4  by the claimant that appears less than candid, unexplained or inadequately explained failure to

5  seek treatment, failure to follow a prescribed course of treatment, claimant's daily activities,

6  claimant's work record, or the observations of treating and examining physicians. *Smolen*, 80

7  F.3d at 1284; *Orn v. Astrue*, 495 F.3d 625, 638 (2007).

8    Daily activities have long been recognized as a proper consideration when the ALJ

9  engages in a credibility determination.  *Bunnell*, 947 F.2d at 346 (quoting SSR 88-13 (1988))

10  (superceded by SSR 95-5p (1995)); *see also Smolen*, 80 F.3d at 1284; *Burch*, 400 F.3d at 680;

11  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *Morgan v. Commissioner of Social Sec.*

12  *Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  Furthermore, if a claimant is able to spend a

13  substantial part of his day engaged in pursuits involving the performance of physical functions

14  that are transferable to a work setting, a specific finding as to this fact may be sufficient to

15  discredit a claimant's allegations.  *Morgan*, 169 F.3d at 600; *Fair*, 885 F.2d at 603.  The ALJ

16  must make "specific findings relating to [the daily] activities" and their transferability to

17  conclude that a claimant's daily activities warrant an adverse credibility determination.  *Orn v.*

18  *Astrue*, 495 F.3d at 639.

19    In *Fair*, the court upheld an ALJ's credibility determination based in part on claimant's

20  daily activities that included caring for all his own personal needs, the performance of his own

21  routine household maintenance and shopping chores, riding public transportation, and driving his

22  own automobile.  *Fair*, 885 F.2d at 604.  Likewise, in *Morgan*, the court found no error when the

23  ALJ's credibility determination relied in part on daily activities of the claimant that included the

24  ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child.

25  *Morgan*, 169 F.3d at 600.  In the instant case, the ALJ's credibility determination was swayed by

26  Plaintiff's daily activities which included the following findings:

27    I note the claimant does significant activities of daily living.  For example, she
      testified that she lives with her husband and 4 children (ages 12-20), her daughter-
28    in-law, and grandson.  Claimant said she drives an automatic SUV about 3-4

1
2
3
4
5

times a week.  She said that she lives in a house and there are no stairs or steps inside the house, but there is one step into the house.  The claimant said that, except for the last 2 weeks, she babysits her grandson for 2-8 hours.  The claimant said that she can care for her own personal needs, cooks 3 times a week, cleans up and does the dishes twice a day.  She said that she cleans the kitchen, bathrooms, vacuums, and does laundry.  She said that she goes grocery shopping and goes to church.  She said that she talks on the phone regularly and visits family or friends once a month.  She said that she reads the Bible or listens to the radio and uses her home computer.

6      (AR 17.) Thus, the ALJ's reliance on Plaintiff's daily activities as a factor in its credibility

7   determination was proper as it was supported by substantial evidence and free from legal error.

8          Plaintiff correctly asserts that the ALJ must relate the transferability of daily activities to a

9   work setting in order to conclude that a claimant's daily activities warrant an adverse credibility

10  determination. *Burch,* 400 F.3d at 681; *Orn v. Astrue*, 495 F.3d at 639.  In support of her

11  assertion, Plaintiff cites *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201.  (Doc. 16 at 11, 13.)  In

12  *Gonzalez,* the court held that the ALJ's negative credibility determination was insufficiently

13  substantiated as it merely indicated that the ALJ probably disbelieved the excess pain testimony

14  because it was "out of proportion to the medical evidence." *Id.* at 1201.  The *Gonzalez* court

15  rationalized this holding by stating:

16
17
18

While the ALJ's failure to link his discounting of the appellant's pain testimony to the appellant's testimony about his daily activities may seem to be a minor error, we are wary of speculating about the basis of the ALJ's conclusion-especially when his opinion indicates that the conclusion may have been based exclusively upon an improper reason.

19   *Id.* This rational is incongruous with the case presently before this Court.  Unlike *Gonzalez*, the

20  ALJ in the proceeding below relied on a number of reasons, including but not limited to,

21  Plaintiff's daily activities, attempts to secure employment, missed doctor's appointments, as well

22  as the inconsistency between Plaintiff's subjective symptom testimony and the objective medical

23  evidence contained in the record.  (AR 16-18.)

24          In *Orn v. Astrue*, 495 F.3d 625 the ALJ rejected the Plaintiff's testimony because his

25  activities of reading, watching television and coloring in coloring books indicated to the ALJ that

26  he was more functional than alleged. *Orn*, 495 F.3d at 639.  The *Orn* court held that

27
28

Neither of the two grounds for using daily activities to form the basis of an adverse credibility determination are present in Orn's case. First, as he described them, Orn's activities do not contradict his other testimony.  Second, Orn's

1   activities do not meet the threshold for transferable work skills, the second ground
    for using daily activities in credibility determinations.
2

3   *Id.* *Orn* is unlike the present case because the ALJ below was presented with inconsistency

4   between Plaintiff's subjective symptom testimony and the objective evidence.  (AR 16-18.)

5   Moreover, in *Orn*, the ALJ's failure to discern the transferability of work skills was due in large

6   part because Orn's reading, watching television and coloring, did not meet the threshold for

7   transferable work skills, which is unlike this case because the nature and scope of Plaintiff's

8   daily activities – babysitting, cooking, driving, cleaning the kitchen and bathroom, doing laundry

9   and folding clothes, using the telephone and computer, shopping, reading and listening to the

10  radio – permitted the ALJ to make such an inference.  Thus, while the failure of the ALJ to

11  explicitly articulate the transferability of Plaintiff's daily activities to a work setting may permit

12  the Plaintiff to interpret the ALJ's conclusions in a more favorable fashion, the ALJ's credibility

13  determination is rational given the numerous other objective factors cited by the ALJ.  *Burch*,

14  400 F.3d at 680-81.

15      Plaintiff also cites to *Gallant v. Heckler*, 753 F.2d 1450, 1453, 1456 (9th Cir. 1984),  for

16  proposition that the ability to cook a meal and do dishes is not inconsistent with disability.  (Doc.

17  16 at 13.)  However, in *Gallant*, the ALJ rejected the claimant's testimony of persistent, disabling

18  pain despite the fact that said testimony was "corroborated by the medical reports of eleven

19  treating physicians."  *Gallant*, 753 F.2d at 1456.  Here, the ALJ made the following findings with

20  regard to objective evidence:

21          The objective evidence reveals mildly abnormal findings: an MRI dated
        September 14, 2002 revealed decreased disc space at L4-5 and L5-S1 consistent
22      with degenerative disc disease.  On April 4, 2003, an MRI of the lumbosacral
        spine revealed L4/L5 disc protrusion and L5/S1 disc protrusion with mild
23      stenosis.  An electrodiagnostic study on April 14, 2003 revealed no evidence of
        peripheral neuropathy.  X-rays taken on February 19, 2007 in Mexico revealed
24      cervical spondylosis and a herniated disc at C5-6; lumbar x-rays reveal a disc
        protrusion at T11-12 and a herniated disc at L4-5 and L5-S1.
25          There are multiple worker's compensation check-block forms indicating
        that the claimant was temporarily totally disabled at various times.  However, I
26      afford them little weight because the lack all signs, symptoms, residual functional
        capacity assessment, or indication of any bases for the opinions.  Moreover, the
27      forms are all signed by chiropractors, who are not acceptable medical sources
        under the Regulations.  More importantly, the chiropractors' opinions that
28

1    claimant is "disabled" impact an issue reserved to the Commissioner under the
     Social Security Act.
2            As for the opinion evidence, on February 4, 2006, Jamie Lewis, M.D., a
     consultative examiner (CE), found that the claimant could perform a wide range
3    of light work; stand/walk up to 4 hours in an 8-hour day; sit up to 6 hours in an 8-
     hour day with alternate sitting/standing; postural activities limited to less than 1/3
4    of the work day; lift/carry up to 20 pounds occasionally and 10 pounds frequently.
     The CE diagnosed chronic back pain based on MRI evidence of disc protrusion
5    and mild muscle weakness; myofascial neck pain; and mild left lateral
     epicondylitis.  The diagnoses were based on the MRI repot dated September 16,
6    2002; and, mild tenderness on palpation of the cervical and lumbar paraspinal
     muscles.  I find the CE's opinion is entitled to substantial weight as it is supported
7    by the objective findings.  The CE's opinion is also supported by the State
     nonexamining DDS medical consultant's opinion: based on the objective findings
8    of record including the CE's examination findings, the consultant opined that the
     claimant could perform light work with occasional postural activities.
9

10   (AR 18, internal citations omitted.)  It is clear that this case is unlike *Gallant* in that Plaintiff's

11   subjective testimony is not substantiated by the objective medical evidence.  (AR 18.)  Thus,

12   despite Plaintiff's assertion to the contrary, this Court finds the ALJ had no further duty to

13   develop the record as the evidence before him allowed for a proper evaluation, and the ALJ's

14   credibility determination was supported by substantial evidence.

15           With regard to Plaintiff's missed doctor appointments, the ALJ's use of this information

16   was a proper factor in evaluating the Plaintiff's subjective symptom testimony.  "In evaluating

17   the intensity and persistence of your symptoms, we consider all of the available evidence,

18   including your history, the signs and laboratory findings, and statements from you, your treating

19   or nontreating source, or other persons about how your symptoms affect you."  20 C.F.R. §

20   404.1529 (c); *see also Smolen*, 80 F.3d at 1284 (unexplained failure to seek treatment may be

21   considered in credibility evaluation).

22           Here, the ALJ noted that "[a]lthough the [Plaintiff] testified that she is fully compliant

23   with medications and treatment, her credibility is diminished due to her record of multiple failed

24   appointments."  (AR 18.)  Of particular significance, as pointed out by Defendant, is the August

25   22, 2002, appointment that indicates that Plaintiff was a "no show." (AR 406).  Given that this

26   missed appointment was one week after Plaintiff's disability arose, it is more than reasonable for

27   the ALJ to infer that Plaintiff's subjective pain testimony was not as debilitating as Plaintiff

28

1    made it out to be.  Given the reasonableness of this interpretation, the ALJ's determination will

2    not be disturbed.  *Burch*, 400 F.3d at 680-81.

3        Finally, Plaintiff's ongoing efforts to secure employment may also be properly considered

4    by the ALJ.  20 C.F.R. § 404.1529(a).  Additionally, the ALJ is entitled to draw inferences

5    "logically flowing from the evidence."  *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (citing

6    *Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir.1982).)  In this instance, the ALJ noted that

7    Plaintiff "has looked for other work" and had done so "as recently as the week of the hearing, on

8    June 1, 2007."  (AR 17-18.)  Moreover, the record reflects that Plaintiff sent out resumes and

9    submitted applications to various potential employers in April 2006 and again in July 2006, has

10   researched certain careers and thought she could work as a teacher's aide for special needs

11   children, court interpreter, or real estate agent, and believed she could work a "less physical

12   job."[5]  (AR 44, 138, 151, 153.)  It was reasonable for the ALJ to consider Plaintiff's ongoing

13   efforts to obtain employment in making his credibility determination.  Moreover, the ALJ's

14   interpretation of this evidence, when coupled with the those factors already discussed, permit the

15   rational conclusion that Plaintiff could still perform some light work.  *Burch*, 400 F.3d at 679.

16   Thus, the ALJ's credibility determination is proper and free of legal error.

17       Plaintiff also contends that rejection of Plaintiff's testimony based solely on inconsistency

18   with, or lack of, objective evidence constitutes legal error.  (Doc. 16 at 7-8.)  Defendant, on the

19   other hand, argues that in light of the inconsistency between Plaintiff's testimony and the

20   objective record, the ALJ was required to engage in an credibility determination of Plaintiff's

21   subjective symptom testimony to determine the severity of Plaintiff's symptoms.  (Doc. 21 at 13.)

22       The scope of the ALJ's disability evaluation with regard to Plaintiff's symptoms is

23   governed by Title 20 of the Code of Federal Regulations section 404.1529, which states "[i]n

24   determining whether you are disabled, we consider all your symptoms, including pain, and the

25   extent to which your symptoms can reasonably be accepted as consistent with the objective

26   medical evidence and other evidence."  The statute goes on to explain that "we will not reject

27

28       [5] Contrary to Plaintiff's assertion, discussion of record evidence supporting the ALJ's decision is not post hoc rationale.  *Warre v. Commissioner*, 439 F.3d 1001, 1005 n.3 (9th Cir. 2006).

1  your statements about the intensity and persistence of your pain or other symptoms or about the

2  effect your symptoms have on your ability to work solely because the available objective medical

3  evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2).

4  As Defendant points out, Plaintiff does not dispute the ALJ's weighing of any particular

5  piece of medical evidence.  (Doc. 21 at 13.)  Rather, Plaintiff simply asserts that the ALJ failed to

6  accord her subjective testimony sufficient weight given the debilitating effects she attested to.

7  (Doc. 16 at 9.)  As stated above, while the evidence may permit one to arrive at a conclusion

8  different than that of the ALJ, the ALJ's credibility determination will not be disturbed unless it

9  is irrational.  *Burch*, 400 F.3d at 679.   Furthermore, if this Court were to grant Plaintiff's

10  requested relief, despite the ALJ's finding that the objective medical evidence does not support

11  such a position, it would be doing so based solely on the weight of Plaintiff's subjective

12  symptom testimony.  This outcome is precluded by statute:

13  [Plaintiff's] statements  about your pain or other symptoms will not alone
establish that you are disabled; there must be medical signs and laboratory
14  findings which show that you have a medical impairment(s) which could
reasonably be expected to produce the pain or other symptoms alleged and which,
15  when considered with all of the other evidence (including statements about the
intensity and persistence of your pain or other symptoms which may reasonably be
16  accepted as consistent with the medical signs and laboratory findings), would lead
to a conclusion that you are disabled.

17  20 C.F.R. § 404.1529(a).  Plaintiff's requested relief is not warranted.  Plaintiff does not dispute

18  the ALJ's weighing of any particular piece of medical evidence, and has not brought to this

19  Court's attention any piece of evidence that could be construed as supporting Plaintiff's

20  testimony concerning the intensity, persistence and limiting effect of her symptoms.  Thus, this

21  Court's only reasonable alternative is to accept the ALJ's determination as it stands.  *Burch*, 400

22  F.3d at 679.

23  **B.    *Residual Functional Capacity***

24  Plaintiff contends that the ALJ's determination that she is not disabled is error because

25  her subjective symptom testimony "demonstrate[s] that she is incapable of maintaining

26  substantial gainful work activity."  (Doc. 16 at 5.)  In turn, Defendant contends that Plaintiff is

27

28

22

1  posing the incorrect standard for disability and that substantial evidence supports the ALJ's

2  determination that Plaintiff could perform some light work.  (Doc. 21 at 7-9.)

3       Residual functional capacity ("RFC") is an assessment of an individual's ability to do

4  sustained work-related physical and mental activities in a work setting on a regular and

5  continuing basis.  The RFC considers only functional limitations and restrictions which result

6  from an individual's medically determinable impairment or combination of impairments.

7       In assessing RFC, the adjudicator must discuss the individual's ability to perform

8       sustained work activities in an ordinary work setting on a regular and continuing
     basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and
     describe the maximum amount of each work-related activity the individual can

9       perform based on the evidence available in the case record. The adjudicator must
     also explain how any material inconsistencies or ambiguities in the evidence in

10       the case record were considered and resolved.

11  SSR 96-8p.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in

12  the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms,

13  including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins*

14  *v. Social Security Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

15       In this case, the ALJ made the following RFC determination concerning Plaintiff's

16  ability to perform work activities:

17       After careful consideration of the entire record, it is found that the claimant has
     the residual functional capacity to perform a wide range of light work: lift/carry up

18       to 20 pounds occasionally and 10 pounds frequently; stand/walk up to 4 hours
     each in an 8-hour day; sit up to 6 hours in an 8-hour day with alternate

19       sitting/standing; pushing/pulling limited to occasionally with the left upper
     extremity; postural activities limited to frequent climbing (ramp/stairs,

20       ladder/rope/scaffolds), balancing kneeling and crawling; and, occasional stooping
     and crouching.

21

22  (AR 16.)  In making this determination, the ALJ relied on the following evidence:

23       The claimant testified that she was born on October 4, 1967 and completed
     high school and 2 years of college with a certificate.  She said that she was injured

24       on the job on August 10, 2002 after lifting a client.  She said that she worked for a
     week after the injury on light duty and has looked for other work.

25       I note the claimant does significant activities of daily living.  For example,
     she testified that she lives with her husband and 4 children (ages 12-20), her

26       daughter-in-law, and grandson.  Claimant said she drives an automatic SUV about
     3-4 times a week.  She said that she lives in a house and there are no stairs or steps

27       inside the house, but there is one step into the house.  The claimant said that,
     except for the last 2 weeks, she babysits her grandson for 2-8 hours.  The claimant

28       said that she can care for her own personal needs, cooks 3 times a week, cleans up

and does the dishes twice a day.  She said that she cleans the kitchen, bathrooms, vacuums, and does laundry.  She said that she goes grocery shopping and goes to church.  She said that she talks on the phone regularly and visits family or friends once a month.  She said that she reads the Bible or listens to the radio and uses her home computer.

Claimant alleged that she has a lumbar disc syndrome, neck and back problems, migraine headaches, and high blood pressure.  She said that she takes medication for the high blood pressure, and also takes pain medication.  She said that nothing controls the headaches and has to lie down.  She said that she is able to lift /carry 10 pounds, stand 15-20 minutes, sit for 1 hour, walk 1/4 mile, and has to lie down for up to 3 hours a day.

After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The objective evidence reveals mildly abnormal findings: an MRI dated September 14, 2002 revealed decreased disc space at L4-5 and L5-S1 consistent with degenerative disc disease.  On April 4, 2003, an MRI of the lumbosacral spine revealed L4/L5 disc protrusion and L5/S1 disc protrusion with mild stenosis.  An electrodiagnostic study on April 14, 2003 revealed no evidence of peripheral neuropathy.  X-rays taken on February 19, 2007 in Mexico revealed cervical spondylosis and a herniated disc at C5-6; lumbar x-rays reveal a disc protrusion at T11-12 and a herniated disc at L4-5 and L5-S1.

There are multiple worker's compensation check-block forms indicating that the claimant was temporarily totally disabled at various times.  However, I afford them little weight because the lack all signs, symptoms, residual functional capacity assessment, or indication of any bases for the opinions.  Moreover, the forms are all signed by chiropractors, who are not acceptable medical sources under the Regulations.  More importantly, the chiropractors' opinions that claimant is "disabled" impact an issue reserved to the Commissioner under the Social Security Act.

As for the opinion evidence, on February 4, 2006, Jamie Lewis, M.D., a consultative examiner (CE), found that the claimant could perform a wide range of light work; stand/walk up to 4 hours in an 8-hour day; sit up to 6 hours in an 8-hour day with alternate sitting/standing; postural activities limited to less than 1/3 of the work day; lift/carry up to 20 pounds occasionally and 10 pounds frequently.  The CE diagnosed chronic back pain based on MRI evidence of disc protrusion and mild muscle weakness; myofascial neck pain; and mild left lateral epicondylitis.  The diagnoses were based on the MRI repot dated September 16, 2002; and, mild tenderness on palpation of the cervical and lumbar paraspinal muscles.  I find the CE's opinion is entitled to substantial weight as it is supported by the objective findings.  The CE's opinion is also supported by the State nonexamining DDS medical consultant's opinion: based on the objective findings of record including the CE's examination findings, the consultant opined that the claimant could perform light work with occasional postural activities.

Although the claimant testified that she is fully compliant with medications and treatment; her credibility is diminished due to her record of multiple failed appointments.  The claimant's credibility is further diminished due to the wide range of activities of daily living performed (discussed above) and her ongoing efforts to obtain employment [a corresponding footnote recites that claimant testified that she had looked for full time work as recently as the week of the hearing, on June 1, 2007.

(AR 16-18.)

While Plaintiff may disagree with the ALJ's disability determination, the ALJ's determination is supported by substantial evidence.  (Docs. 16 at 5; 21 at 7-9).  Specifically, the ALJ's negative assessment of Plaintiff's subjective symptom testimony was made after he identified contrary evidence in the form of: (1) objective medical evidence (i.e. MRIs of September 14, 2002 & April 4, 2003; x-rays of February 19, 2007; and electrodiagnostic testing of April 14, 2003), (2) opinion evidence from Dr. Jamie Lewis, which the ALJ determined was entitled to substantial weight because it was consistent with the objective evidence and further supported by the opinion evidence of the State nonexamining DDS, (3) Plaintiff's multiple failed appointments, (4) daily living activities, and (5) ongoing efforts to obtain employment in support of its conclusion.  (AR 16-18.)   The ALJ's interpretation of the all evidence presented, including Plaintiff's subjective symptom testimony and the objective medical record evidence, is rational, free from legal error and supported by substantial evidence.  Therefore, the ALJ's determination shall not be disturbed. *Burch*, 400 F.3d at 679.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Sandra Lemus.

IT IS SO ORDERED.

Dated:    **September 21, 2010**              **/s/ Gary S. Austin**
                                                                    UNITED STATES MAGISTRATE JUDGE